DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

STATE OF FLORIDA,

Appellant,

v.

L.C.,

Appellee.

No. 2D2023-0634
_____

October 16, 2024

Appeal from the Circuit Court for Pinellas County; Kimberly A. Campbell, Judge.

Ashley Moody, Attorney General, Tallahassee, and Wendy Buffington, Assistant Attorney General, Tampa, for Appellant.

Howard L. Dimmig, II, Public Defender, and Joanna Beth Connor, Assistant Public Defender, Bartow, for Appellee.

LaROSE, Judge.

The State appeals the trial court's order suppressing an out-of-court identification and evidence obtained from an investigatory stop and show-up involving L.C. We have jurisdiction. *See* Fla. R. App. P. 9.030(b)(1)(B); 9.140(c)(1)(B). We reverse. Law enforcement officers had a basis to stop L.C., and the show-up procedure was not unduly suggestive.

## I.    Background

The State filed a delinquency petition against L.C., alleging an attempted burglary. *See* §§ 777.04(4)(d), 810.02(4)(b), Fla. Stat. (2021).

L.C. moved to suppress all evidence obtained by law enforcement officers from an alleged unlawful stop and a subsequent suggestive show-up identification by a citizen informant who called law enforcement to report suspicious activity. L.C. asserted that a "be-on-the-lookout" report (BOLO) was too vague to justify a stop. He also challenged the show-up identification procedure because law enforcement officers took the citizen informant to view four suspects and she offered a different description of the suspects than she had in her call to dispatch.

Officer Charlie Flowers appeared at the suppression hearing. He testified that on July 15, 2021, at about 7:30 a.m., he received a dispatch originating from a named informant. The informant reported that four black males with shorts, some without shirts, were breaking into a vehicle. Officer Flowers admitted that the call notes stated that all the males were shirtless. The informant saw the males running northbound from the scene of the apparent burglary.

Officer Flowers and another law enforcement officer reported to the scene. About six or seven minutes after receiving the dispatch, Officer Flowers saw four black males running eastbound. He testified that they were in the area where he expected them to be based on his familiarity with the area and where and when the crime was reportedly committed. The four matched the informant's description. Officer Flowers detained them.

Officer Flowers identified the persons in photographs, State's Exhibits 1(A) through (D), as the suspects. The photographs show that they were males wearing shorts. L.C. was wearing a black shirt; another was wearing a purple shirt. The other two were shirtless.

Officer Flowers testified that although two males wore shirts, he detained all of them. Based on his training and experience, he testified that informants do not always describe a suspect with certainty.

2

Suspects sometimes change clothes, may not be wearing certain clothes at the time, or may "pick up a clothing item, [and] use that clothing item as a glove or some type of evidence." Officer Flowers believed that L.C. and the three others "match[ed] four young black juvenile males in the area of the crime."

Officer Flowers agreed that L.C. was "a little bit lighter" skinned than the others; he described L.C. as "a light-skinned black male." He conceded that he initially reported to dispatch that he observed "four to three black males; one white male, black shirt; one white male, purple shirt." In his supplemental report, Officer Flowers described the suspects as "four black juvenile males" but listed L.C. as a "white male."

Asked about the apparent inconsistency in describing L.C., Officer Flowers testified that mixed race individuals sometimes identify as white and sometimes as black. Officer Flowers explained that there was no option for mixed race in the police department's reporting system. When a person is mixed race, policy requires the officer to enter the person as white. Officer Flowers testified that "[L.C.'s] definitely light skinned and I wouldn't say [L.C.'s] a hundred percent Caucasian."

Officer Jason Russell testified that he responded to the informant's residence, obtained a brief description of what she saw, and then drove her to view the suspects. Officer Russell testified that the suspects were standing in a parking lot and not handcuffed. Officer Russell testified that the informant remained in the patrol vehicle. He asked "if there was anybody there that she recognized; she identified [L.C.]" Officer Russell then asked the informant what she saw L.C. doing. The informant stated that L.C. "was the one that walked up to the vehicle, the car door and pulled on it." Officer Russell asked the informant if she was certain that L.C. was the person she saw. She replied, "100 percent."

3

Defense counsel argued that the officers lacked a basis to detain L.C. because L.C. did not match the description in the BOLO. Defense counsel argued that "Officer Flowers testified multiple different ways as to what [L.C.'s] description was, but under no circumstances did he ever say that he had no shirt." Defense counsel also argued that the show-up identification was "impermissibly suggestive." He added, "[E]ven if the [trial c]ourt finds that the BOLO is sufficient, this subsequent show[-]up procedure is not. It just doesn't pass constitutional muster."

The State countered that L.C. met the BOLO description; Officer Flowers believed L.C. was mixed race, and "it would be very easy for somebody to put a shirt on" during the six minutes before Officer Flowers encountered L.C. The State also observed that the informant was a citizen informant and that the show-up "was all done by the book, and [L.C.] was positively identified immediately by the witness."

The trial court took the motion under advisement. It later rendered an unelaborated written order granting L.C.'s motion.

## II. <u>Discussion</u>

The trial court's order carries a presumption of correctness. *See State v. Jones*, 203 So. 3d 972, 972 (Fla. 2d DCA 2016). We construe the evidence and reasonable inferences in a light "most favorable to sustaining the trial court's ruling." *State v. Shaw*, 784 So. 2d 529, 530 (Fla. 1st DCA 2001). We defer to the trial court's factual findings "if supported by competent, substantial evidence." *See State v. Kennon*, 901 So. 2d 375, 376 (Fla. 2d DCA 2005) (citing *Caso v. State*, 524 So. 2d 422 (Fla. 1988)). However, we review de novo the trial court's legal determination of reasonable suspicion to conduct an investigatory stop. *See Allenbrand v. State*, 283 So. 3d 969, 970 (Fla. 2d DCA 2019) (citing *Beahan v. State*, 41 So. 3d 1000, 1002 (Fla. 1st DCA 2010)). The trial court's finding that law enforcement officers employed an unnecessarily

4

suggestive procedure to obtain an out-of-court identification "is essentially a factual inquiry" subject to an abuse of discretion review.[1] *Alahad v. State*, 362 So. 3d 190, 198, 201-02 (Fla. 2023).

Importantly, in reviewing the trial court's order, "we are precluded from making factual findings in the first instance." *State v. Jenkins*, 120 So. 3d 649, 650 (Fla. 5th DCA 2013) (citing *Douglass v. Buford*, 9 So. 3d 636, 637 (Fla. 1st DCA 2009)). As the fact finder, the trial court is responsible for assessing witness credibility, weighing evidence, and resolving factual disputes. *Searcy v. State*, 285 So. 3d 956, 958 (Fla. 4th DCA 2019) (citing *Shaw*, 784 So. 2d at 533); *Lee v. State*, 868 So. 2d 577, 579 (Fla. 4th DCA 2004).

In aid of appellate review, it is extremely helpful for the trial court to explain its reasoning. *Searcy,* 285 So. 3d at 958. Otherwise, we will affirm only if our appellate review is not impeded and the record offers sufficient evidence to support the trial court's ruling. *See State v. Thomas*, 332 So. 2d 87, 88 (Fla. 1st DCA 1976).

## (1) The Stop

The State argues that the stop was legal because the informant described the suspects as "four black males wearing shorts but no shirts." L.C. was mixed race. His companions were black. All wore shorts. Two were shirtless. Officer Flowers saw them

> running across the street six to seven minutes after the dispatch in a location where the officer, who had lived in this

---

[1] To decide whether to suppress an out-of-court identification, the trial court must apply a two-prong test: (1) whether law enforcement officers used an unnecessarily suggestive procedure and (2) if so, whether under the totality of the circumstances, "the suggestive procedure g[a]ve rise to a substantial likelihood of irreparable misidentification." *Alahad v. State*, 362 So. 3d 190, 198 (Fla. 2023) (quoting *Grant v. State*, 390 So. 2d 341, 343 (Fla. 1980)). Given our disposition regarding the first prong, we need not address the second.

area his whole life, would have expected the suspects to have made it to from the scene in that time and based on the direction of their flight.

L.C. counters that the officers lacked reasonable suspicion to stop him. L.C. argues that the BOLO's "description of four black, shirtless males did not match L.C. because he was neither black nor shirtless, and the group of four males was not travelling in the direction indicated in the BOLO."

A law enforcement officer may stop a person "temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime." *Popple v. State*, 626 So. 2d 185, 186 (Fla. 1993). In assessing the legality of a stop pursuant to a BOLO, the trial court should consider "the length of time and distance from the offense, specificity of the description of the alleged perpetrator(s), the source of the BOLO information, the time of day, absence of other persons in the vicinity of the sighting, suspicious conduct, and any other activity consistent with guilt." *M.M. v. State*, 80 So. 3d 1125, 1127 (Fla. 4th DCA 2012) (quoting *Jean v. State*, 987 So. 2d 196, 198 (Fla. 4th DCA 2008)); *see also Hunter v. State*, 660 So. 2d 244, 249 (Fla. 1995).

Undisputedly, a citizen informant provided the description for the BOLO. *See generally Tobin v. State*, 146 So. 3d 159, 162 (Fla. 1st DCA 2014) (explaining that in contrast to the low reliability of an anonymous tip, a citizen informant's tip "is presumed highly reliable because his or her 'motivation in reporting illegality is the promotion of justice and public safety,' and because the informant gives his or her name to police and 'can be held accountable for the accuracy of the information given' " (quoting *State v. DeLuca*, 40 So. 3d 120, 124 (Fla. 1st DCA 2010))); *State v. Setzler*, 667 So. 2d 343, 348 (Fla. 1st DCA 1995) ("This robbery victim

6

was not anonymous, was not a paid informer, and gave the police no reason to doubt his veracity. The police are entitled to credit ordinary citizens who fall victim to crime, if circumstances give no reason to believe they are fabricating, when a person matching an alleged perpetrator's description is found promptly nearby.").

Officer Flowers saw L.C. within seven minutes of receiving the dispatch. The BOLO said that the perpetrators were running northbound; Officer Flowers stopped L.C. heading east. The directions of travel are not conclusively inconsistent. To the contrary, L.C. was in a location where Officer Flowers, who was familiar with the area, believed the suspects would be.

The BOLO indicated that there were four shirtless black males wearing shorts. When Officer Flowers stopped L.C. and his companions, all four wore shorts; only two were shirtless. But Officer Flowers explained that suspects sometimes change their clothes or use their clothes as gloves instead of wearing them at the time of the crime.

As to L.C.'s racial appearance, Officer Flowers described L.C. as mixed race, or "a light-skinned black male." He explained that a racially mixed individual may identify as black or white. It was police department policy to list a racially mixed individual as white. We cannot say that L.C.'s photograph entered into evidence conflicted with Officer Flowers's testimony about L.C.'s race.[2] *Cf. Almeida v. State*, 737 So. 2d 520, 524 n.9 (Fla. 1999) (recognizing that the trial court is in no better position to evaluate video or audio recordings than is the appellate court).

Based on the totality of the circumstances, law enforcement officers had a reasonable suspicion to detain L.C. *Compare Setzler*, 667 So. 2d

---

[2] The trial court made no findings about L.C.'s racial appearance.

7

at 347 ("As a matter of law, we conclude that the BOLO coupled with the mode, time, and direction of appellees' travel gave Officer Bass a reasonable indication that appellees were the robbers he had been told to be on the lookout for. Although only two of the three were black, Officer Bass not unreasonably surmised that the BOLO might be in error on that point, events having transpired in the dark of night."), *and Bussey v. State*, 528 So. 2d 955, 956-57 (Fla. 3d DCA 1988) (holding there was reasonable suspicion where the tipster identified two black males at the apartment complex and stated that one was wearing a white shirt and brown shorts and officers observed a male and the defendant at the scene and the defendant "matched the BOLO description, except for a slight discrepancy in the color of his shorts," which were blue), *with Sanchez v. State*, 199 So. 3d 472, 474-77 (Fla. 4th DCA 2016) (holding that the officers lacked reasonable suspicion to stop the suspect in a vehicle heading northbound and then eastbound based on a BOLO that two black males were running westbound from the store because the BOLO was "silent to their appearance, mentioned nothing about hair styles, did not include a vehicle, and was inconsistent with the direction of appellant's travel"), *and L.O. v. State*, 44 So. 3d 1290, 1293-94 (Fla. 4th DCA 2010) (holding that the BOLO description of two black males and their clothing did not provide the requisite founded suspicion for the juvenile's detention where the juvenile was stopped while walking alone and farther from the scene than officers reasonably believed the perpetrator would be), *and Sanders v. State*, 666 So. 2d 1035, 1036-37 (Fla. 1st DCA 1996) (holding that the BOLO describing robbers as "two black males, black shirt and pants and one had a white t-shirt on" did not provide the deputy with founded suspicion to stop defendant's automobile where the description came from an anonymous tip, the defendant and other occupants did not exhibit any unusual or furtive

8

behavior, and there were three occupants in vehicle, with only one wearing dark clothing).

Although we would have preferred to have a witness explain whether the four were the only persons in the area, the lack of specificity did not undermine the justification for the stop. *Cf. Setzler*, 667 So. 2d at 347-48 ("While we agree with the trial court that greater specificity as to the times involved and as to the distance between the crime scene and the stop would have been preferable, we cannot agree that the State failed to prove a legal basis for the stop.").

The cases on which L.C. relies are factually distinguishable. The BOLO here was specific and sufficient to support reasonable suspicion. *Cf. Taylor v. State*, 695 So. 2d 503, 504-05 (Fla. 2d DCA 1997) (holding that reasonable suspicion did not exist where the BOLO described a black male riding a bicycle, it was "impossible to determine whether Taylor's location, when stopped, coincided with the estimated location of the perpetrator," and there was no evidence regarding the demographics of the location); *Bellamy v. State*, 696 So. 2d 1218, 1219-20 (Fla. 2d DCA 1997) (holding that reasonable suspicion did not exist where Mr. Bellamy matched the BOLO description of "a black male wearing dark pants, a black and white shirt and a jacket" that sold drugs to an officer and that BOLO description "could have fit many people in the area at a time when many people were on the street"); *State v. K.W.*, 832 So. 2d 803, 803 (Fla. 3d DCA 2002) (holding that probable cause did not exist to detain the juvenile where an anonymous tipster reported a youth wearing all orange clothing was waiving a gun and the officer spotted the juvenile wearing orange shorts but did not observe a gun or bulge in the shorts).

## *(2) The Show-Up*

The trial court made no findings that the law enforcement officers employed an unnecessarily suggestive procedure to obtain an out-of-

9

court identification of L.C. However, L.C. argued to the trial court only that the show-up identification was unlawful because an officer took the informant to view the handcuffed suspects and the informant provided a different description than she had to dispatch.

Recall that Officer Russell testified that the suspects were not handcuffed when he brought the informant to the scene. But, even if the trial court found that L.C. was in handcuffs, "[p]resenting the suspect in handcuffs or with flanking officers does not make the procedure unnecessarily suggestive." *See Alahad*, 362 So. 3d at 204. Further, contrary to L.C.'s assertion, our record reflects no evidence that the informant provided a conflicting description of the suspects. Indeed, she promptly identified L.C. as a perpetrator. Accordingly, we cannot say that law enforcement officers used an unnecessarily suggestive procedure to obtain L.C.'s identification.

### III.   Conclusion

Law enforcement officers had a reasonable suspicion to stop L.C. Nothing in the record established that the law enforcement officers used an unnecessarily suggestive procedure to obtain his out-of-court identification. We reverse the trial court's order granting L.C.'s motion to suppress and remand this matter for further action consistent with this opinion.

Reversed and remanded.

SLEET, C.J., and MORRIS, J., Concur.

_____

Opinion subject to revision prior to official publication.